UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY LETRICE TOWNSEL<br><br>Petitioner,<br><br>v.<br><br>RON DAVIS<br><br>Respondent. | Case No. 1:19-cv-01394-JLT-CDB  (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**[1]<br><br>**14-DAY DEADLINE**<br><br>(Doc. 1) |

On October 4, 2019, Petitioner Anthony Letrice Townsel ("Petitioner"), a state prisoner proceeding *pro se*,[2] filed a petition for writ of habeas corpus ("Petition").  (Doc. 1).  On June 4, 2020, Respondent filed an answer (Doc. 34), arguing Petitioner was not entitled to habeas relief, and lodged the state court record in support (Docs. 28 through 33).  Petitioner, through appointed counsel,[3] filed a reply.  (Doc. 72).  For the reasons set forth below, the undersigned recommends that the district court deny the Petition and decline to issue a certificate of appealability.

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Csl. 2022).

[2] Although Petitioner filed his petition *pro se*, the state public defender assisted him in compiling the necessary documents and pleadings to file his petition. (*See* Doc. 1-4 at 1).

[3] *See* Doc. 36.

1    **I.    PROCEDURAL AND FACTUAL BACKGROUND**

2    A jury in the Madera County Superior Court convicted Petitioner of (1) the murder of

3    Mauricio Martinez, Jr. in violation of Penal Code § 187(a) with special allegations that Petitioner

4    was convicted of multiple murders and used a firearm;  (2) the murder of Martha Diaz with

5    special allegations that the murder resulted in the termination of a pregnancy, Petitioner used a

6    firearm, and the victim was a witness to a crime; and (3) attempting to prevent and dissuade a

7    witness in violation of Penal Code § 136.1(c)(1).[4]  (ECF No. 28-3 at 280-88).[5]  The jury returned

8    a verdict of death, and the trial court sentenced Petitioner accordingly.  (*Id.* at 297; *see* ECF No.

9    28-4 at 163-64).

10    On appeal, the California Supreme Court summarized the pertinent facts of the underlying

11    offenses:[6]

12    > In September 1989, Martha Diaz and her son Andrew were staying
13    > in the home of her sister, Teresa Martinez, on Saunders Road in
     > Madera. Also living there were Teresa's husband, Mauricio; their
14    > two children; and Mauricio's friend Luis Anzaldua. Mauricio's
     > parents and siblings lived in the house next door. Diaz was six
15    > months pregnant with defendant's child.

16    > On September 18, 1989, defendant came to Teresa's house and
     > spoke with Diaz about the baby. The conversation was not
17    > amicable.

18    > On the evening of September 21, 1989, defendant encountered
     > Luidivina Hernandez, a mutual friend of his and Diaz's. He asked
19    > her if she had seen or spoken to Diaz, and whether Diaz had said
     > anything about him. Hernandez acknowledged having seen Diaz
20    > and told him Diaz had said only that they were having problems.
     > Defendant told her he wanted nothing further to do with Diaz or the
21    > baby, and that if he couldn't have her, neither could anyone else.

22    > About 10:00 the following morning, defendant and a companion
     > pulled up to Teresa's house in a brown car. Defendant got out,
23    > handed Teresa an envelope containing a letter, and angrily told her
     > to tell Diaz she had better stay in the house. After he drove away,
24    > Teresa showed Diaz the envelope and letter, which was dated
     > September 20, 1989, and addressed to defendant from the Madera
25    > Justice Court. It informed him that a criminal complaint charging

---

26    [4] The jury found Petitioner not guilty of discharging a firearm at an inhabited dwelling or occupied building.  (Doc.
     28-3 at 287.

27    [5] Record citations herein are to the CM/ECF-assigned pages.

28    [6] These facts are entitled to a presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804
     F.3d 998, 1010-11 (9th Cir. 2015).

him with a violation of section 273.5 (battery or willful infliction of injury on a spouse or cohabitant) was on file against him and directed him to appear in court on November 7, 1989.

About 5:00 that evening, Teresa, Diaz, and their children, along with Luis Anzaldua, were sitting in front of Teresa's house. Mauricio's brother, Rene, was near an ice cream truck parked between Teresa's house and his residence. Defendant and a passenger pulled up in a gray Cadillac. From the car, defendant made a hand gesture like a pistol, yelled at Diaz to get back in the house and that "your ass is mine after the baby is born," and drove away.

Three hours later, around 8:00 p.m., Teresa and her family, including Diaz, along with Rolando Martinez and Luis Anzaldua, were in her house when they heard gunshots outside. Rene and his sister Valerie, next door, also heard the gunshots. Rene and Valerie went to the window and saw defendant shooting a handgun in the air before getting into a gray Cadillac and driving away. After the shooting, family members collected shell casings from the street and gave them to Madera County Sheriff's Deputy Gerald Stephen Kirkland, telling him defendant was the shooter.

Still later that night, around 11:00 p.m., Rene, Rolando, and Anzaldua heard more gunshots outside their houses. Rene and Rolando saw shots being fired from the passenger window of a moving gray Cadillac. Rolando saw two figures in the car, which drove away at a high speed without stopping. Deputy Kirkland again responded to the family's call to the police, and collected more shell casings. Bullet holes were later seen in the garage door and a window of Teresa's house.

About 11:30 the next morning, Anzaldua, Diaz, and Andrew were driving in Anzaldua's car. Stopping at an intersection, they noticed two men standing near a gray Cadillac parked at a gas station. Frightened, Diaz said, "There he is." Anzaldua understood her to be referring to defendant. One of the two men got into the driver's seat of the Cadillac.

Believing he was going to be chased, Anzaldua drove into town, going as fast as 70 miles per hour. The Cadillac followed, matching his speed. As Anzaldua neared the local sheriff's station, the Cadillac crashed into a fire hydrant. Anzaldua and Diaz got out of his car and tried to enter the station, only to find the front and back doors locked. Seeing a tall, dark-complected man wearing a white T-shirt and blue pants walking toward them, Anzaldua, who had worked in the station as a janitor, led Diaz to the basement. There they hid for about 10 minutes before going upstairs, where they told the deputy on duty what had happened. The deputy informed them a suspect was already in custody at the crash site. Anzaldua and Diaz went to the site and saw a Mexican male in custody. Anzaldua and Diaz then returned to their residence, and Anzaldua went to Rene's house next door to visit.

The same day, between about 12:30 and 12:45 p.m., Teresa and Diaz were in the living room of Teresa's home with their children and Mauricio was in the master bedroom. Anzaldua and Mauricio's siblings Rene, Valerie and Marybell were next door at Mauricio's parents' home. A neighbor, David Sepulveda, saw a gray car, possibly an LTD or a Thunderbird, park next to his fence. A Black man he later identified as defendant exited the passenger side of the car, which drove away. In Teresa's house Diaz, seeing defendant approach, picked up her son and ran from the living room. Teresa stepped toward the front door intending to ask defendant what he wanted with Diaz. Defendant opened the door and entered, a gun at his side in his left hand, and Teresa froze. Defendant looked at her without saying anything and walked down the hallway, bumping into Mauricio, who had emerged from the bedroom. Defendant raised his gun and fired twice, hitting Mauricio in the chest. Defendant continued toward the master bedroom, stopping in the doorway to fire three shots in rapid succession. Teresa fled to her in-laws' house next door.

Inside the in-laws' house, Rene, Valerie, Marybell and Anzaldua heard shots being fired. Sepulveda also heard the shots from inside his home and told his wife to call 911. Rene, Valerie and Marybell ran outside and met Teresa, who told them the shooter was defendant. All four took refuge in the in-laws' house, but Teresa soon became concerned about her child, who was still in her house. She started to leave the in-laws' house, but just then defendant left Teresa's house, firing his gun in the air, and approached the in-laws' house. Rene retrieved his rifle and loaded it as Teresa called 911. He and Teresa went to the open garage door and saw defendant walk toward Raymond Thomas Street, which intersects Saunders Road, and fire into the gas tank of Anzaldua's car, parked in front of Teresa's house. Rene took aim and shot defendant in the back of the neck. Defendant fell and crawled some distance before collapsing.

Teresa and Rene ran back to her house and found Mauricio lying prone on the front porch. Inside the house, Rene found Diaz in the master bedroom with bullet holes in her face and neck, her son standing in front of her crying.

When Sergeant Bob Holmes of the Madera County Sheriff's Department arrived on the scene, defendant was lying supine on the ground, holding a 9-millimeter Taurus semiautomatic handgun with the hammer cocked and ready to fire. Sergeant Holmes kicked the gun out of his hand. Defendant identified himself and said he was the shooter. Madera County Sheriff Glenn Seymour arrived shortly after Sergeant Holmes and remained with defendant while Holmes investigated. Sheriff Seymour asked defendant what was going on. Defendant replied: "I did it. There's no one else to worry about." David Sepulveda approached the sheriff and told him defendant was the shooter. Defendant told Sepulveda to shut up, adding, "or you will get it, too."

Teresa Martinez approached defendant as he lay on the ground and asked, "Why my husband?" Defendant indicated he was not through yet and "Morris" was going to "come and finish you off."

4

As paramedics were attending to him, defendant said, "I was paid to do a job and I did it."

Autopsy results showed that Mauricio had been shot twice. One bullet, fired at close enough range to leave powder residue and tattooing on the left side of his face, entered near the right armpit and exited on the right side of the chest without hitting any vital organs. The second, fatal bullet entered the upper right shoulder, moving in a downward trajectory to strike a pulmonary artery within the lower lobe of the right lung and passing through the thoracic aorta, striking the left kidney, and exiting the left flank. Mauricio would have been crouched very low or bent at the waist when this second bullet entered, consistent with his having assumed a defensive posture.

Diaz had been shot five times, suffering wounds to the upper right thigh, right arm, left ear, nose, and the nape of the neck. The latter two wounds, which were fatal, fractured the base of her skull and caused a brain stem concussion. Her six-month fetus appeared normal and "died simply because he lost his life support, his mother."

Criminalist John Hamman tested defendant's handgun and determined that its magazine could hold 15 rounds and the chamber an additional round, for a total of 16 rounds. Cartridge casings and bullets recovered from the crime scene were all definitely or probably fired by defendant's gun.

In an effort to show that defendant lacked the mental state required for the charged offenses, the defense presented the testimony of three psychologists who had evaluated defendant and concluded he is mildly to moderately intellectually disabled. … In rebuttal, the prosecution presented the testimony of psychiatrist Lee Coleman, M.D., to the effect that IQ testing is not a reliable measure of intelligence, behavior is the best indicator of mental state, and mental health professionals have no greater ability than lay persons to tell who is malingering. … The prosecution also presented evidence that defendant was placed in special education classes in school because of a learning handicap, not because he was thought to be intellectually disabled; he functioned well in prior employment; and, while incarcerated, he regularly requested and appeared to read daily newspapers. The parties stipulated that defendant had a California driver's license.

(Doc. 30-14 at 2-7 (footnote omitted)).  On appeal, the California Supreme Court reversed the conviction for dissuading a witness and vacated the witness-killing special circumstance finding, but otherwise affirmed the judgment.  (Doc. 30-14 at 1).

On February 20, 2014, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, including a claim pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002).

(Doc. 33-1).  On February 14, 2018, in light of evidence submitted that Petitioner was

intellectually disabled, the California Supreme Court ordered the Secretary of the Department of

Corrections and Rehabilitation to show cause why Petitioner's death sentence should not be

vacated and Petitioner sentenced to life imprisonment without the possibility of parole.  (Doc. 33-

41).  The court denied Petitioner's additional claims on the merits but without explanation.  (*Id.*).

The state chose not to show cause, and the parties stipulated that "a writ of habeas corpus should

be granted based on Petitioner's *Atkins* claim, his sentence of death should be vacated, and he

should be resentenced to life imprisonment without the possibility of parole."  (Doc. 33-42 at 2).

The trial court entered an amended abstract of judgment on August 1, 2019.  (Doc. 33-43).

Petitioner now raises eighteen claims for relief:

1)    Petitioner was incompetent at the time of his trial and was deprived of his right to an adequate, fair and reliable determination of competency due to trial counsel's failure to investigate and present evidence of Petitioner's developmental disability of mental retardation and mental disorder.

2)    Reversal of the guilt judgment is required because the trial court violated Petitioner's federal constitutional rights to due process and reliable guilt and penalty determinations by failing to suspend the proceedings and appoint the director of the regional center for the developmentally disabled to evaluate him in light of substantial evidence that Petitioner was both intellectually disabled [and] incompetent.

3)    Trial counsel's prejudicially deficient performance in failing to investigate and present evidence of Petitioner's intellectual disability and mental illness deprived Petitioner of his rights to the effective assistance of counsel and to a fair and reliable determination of guilt.

4)    Trial counsel rendered ineffective assistance of counsel by failing to investigate, prepare and present evidence of Petitioner's mental state that would have resulted in verdicts less than first degree murder.

5)    The trial court's instructional error improperly limited the jurors' consideration of the intellectual disability evidence to the sole element of malice aforethought and precluded their consideration of the evidence on the element of premeditation and deliberation.

6)    The trial court violated Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights by permitting Lee Coleman to present his unqualified and legally incorrect "expert" opinion that all expert diagnoses of mental retardation, along with all related

6

intelligence testing, is so inherently unreliable as a class that it is legally irrelevant and should be completely disregarded by jurors.

7)      The trial court erred in admitting the opinions of unqualified lay witnesses and hearsay declarants that Petitioner was not intellectually disabled in his developmental years in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

8)      The trial court erred in overruling Petitioner's objections to the prosecutor's cross-examination of Dr. Christensen regarding her opinion that Petitioner was not competent to stand trial due to the developmental disability of intellectual disability, and violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

9)      The cumulative effect of the errors raised in claims five, six and seven, undercutting Petitioner's intellectual disability-based defense was prejudicial and violated his federal constitutional rights to a fair trial, proof beyond a reasonable doubt and trial by jury on every element of the charge offenses, a meaningful opportunity to present his defense and reliable jury verdicts that he was guilty of a capital offense.

10)     Trial counsel rendered ineffective assistance of counsel by failing to prevent the admission of false evidence in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

11)     Petitioner was denied his right to the effective assistance of counsel by counsel's failure to exclude the pretrial mental disorder competency evaluations from the underlying trial and by counsel's failure to object to the prosecution's improper use of the evaluations at trial.

12)     Trial counsel failed to present readily available expert evidence to challenge the prosecution's evidence and argument regarding the aggravated nature of the killings of both Mauricio Martinez and Martha Diaz.

13)     Trial counsel rendered ineffective assistance by failing to make the correct evidentiary proffer to admit critical evidence at both the guilt and penalty phases of trial.

14)     Petitioner was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments based on juror misconduct at the guilt and penalty phases of his trial.

15)     The trial court's unauthorized restrictions on Petitioner's communications with trial jurors and Respondent's refusal to interview a juror violated Petitioner's constitutional rights.

16)     The shackling of Petitioner throughout the trial was unconstitutional and prejudicial.

1      17)    Deficiencies, impediments, and obstacles in trial and post-
2             trial processes render Petitioner's convictions and sentence
              unreliable and unconstitutional.

3      18)    The cumulative nature of the errors in this petition requires
4             the granting of habeas corpus relief.

5 (Doc. 1-3 at 14, 42, 53, 196, 233, 241, 255, 264, 275, 279, 290, 304, 318, 322, 325, 335, 341,

6 351).

7 ## II.     STANDARD FOR FEDERAL HABEAS RELIEF

8        A federal court's statutory authority to issue habeas corpus relief for persons in state

9 custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

10 Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

11 first "exhaust[t] the remedies available in the courts of the State."[7]  28 U.S.C. § 2254(b)(1)(A).

12 Where the state court adjudicates the claim on the merits, a petitioner is not entitled to habeas

13 relief unless the adjudication (1) "resulted in a decision that was contrary to, or involved an

14 unreasonable application of, clearly established Federal law, as determined by the Supreme Court

15 of the United States," or (2) "resulted in a decision that was based on an unreasonable

16 determination of the facts in light of the evidence presented in the State court proceeding."  28

17 U.S.C. § 2254(d).

18        "Deciding whether a state court's decision 'involved' an unreasonable application of

19 federal law or was 'based on' an unreasonable determination of the facts requires the federal

20 habeas court to 'train its attention on the particular reasons—both legal and factual—why state

21 courts rejected a state prisoner's federal claims."  *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

22 When the state court's decision "does not come accompanied with [its] reasons" for the decision,

23 a federal court "should 'look through' the unexplained decision to the last related state-court

24 decision that does provide a relevant rationale."  *Id.*  However, when there is no reasoned decision

25 to "look through," it may be presumed—in "the absence of any indication or state-law procedural

26 principles to the contrary"—that the state court adjudicated the claim on the merits and the

27 petitioner must show "there was no reasonable basis for the state court to deny relief."

28

---

[7] The statute allows for limited exceptions inapplicable here.  *See* 28 U.S.C. § 2254(b)(1)(B).

1    *Harrington v. Richter*, 562 U.S. 86, 98-99 (2011).

2         Under 2254(d)(1), a decision is "contrary to" clearly established federal law if the state

3    court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case

4    law; or (2) reached a different result from the Supreme Court when faced with materially

5    indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). A state court decision

6    involves an "unreasonable application" of the Supreme Court's precedents if the state court

7    correctly identifies the governing legal principle but applies the facts of the petitioner's case in an

8    objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state

9    court either unreasonably extends a legal principle from [Supreme Court] precedent to a new

10   context where it should not apply or unreasonably refuses to extend that principle to a new

11   context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "A state court's

12   determination that a claim lacks merit precludes federal habeas relief so long as fair-minded

13   jurists could disagree on the correctness of the state court's decision." *Harrington*, 62 U.S. at

14   101. The petitioner must show that the state court decision "was so lacking in justification that

15   there was an error well understood and comprehended in existing law beyond any possibility for

16   fairminded disagreement." *Id.* at 103.

17        Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely

18   because the federal habeas court would have reached a different conclusion in the first instance."

19   *Wood v. Allen*, 558 U.S. 290, 301 (2010). "State courts are accorded substantial deference. If

20   reasonable minds reviewing the record might disagree about the finding in question, on habeas

21   review that does not suffice to supersede the trial court's determination." *Marks v. Davis*, 106

22   F.4th 941, 949 (9th Cir. 2024) (citations and quotation marks omitted) (quoting *Brumfield v.*

23   *Cain*, 576 U.S. 305, 314 (2015)).

24   **III.    ANALYSIS**

25        Petitioner represents that he presented each of his claims to the state courts, either on

26   direct review (Claims Two and Five through Nine) or in his state habeas petition (Claims One,

27   Three, Four, and Ten through Eighteen). Respondent does not dispute that Petitioner has

28   exhausted each claim. Accordingly, the claims must be evaluated under the deferential AEDPA

1  standard.

2  **A.  Withdrawn Claims**

3  In his reply, Petitioner withdraws Claims Thirteen, Fifteen, Sixteen, and Seventeen.  (Doc.

4  72 at 13).  Thus, these claims no longer remain pending, and the Court need not address their

5  merits.

6  **B.  Ineffective Assistance of Counsel – Competency Proceedings**

7  Claim One focuses on trial counsel's conduct concerning Petitioner's competency.

8  Petitioner challenges trial counsel's failure to specifically inform the trial court that Petitioner was

9  intellectually disabled and request the appointment of the director of the regional center rather

10  than psychologists to assess his competency; counsel's failure to inform the examiners that

11  Petitioner was intellectually disabled; counsel's waiver of a hearing; and counsel's failure to

12  request additional competency proceedings at trial.  (Doc. 1-3 at 21-22).  Petitioner raised these

13  arguments in his state habeas petition and the California Supreme Court summarily denied relief.

14  (Doc. 33-41).

15  **1.  Background**

16  On November 2, 1989, trial counsel Linda Thompson informed the court that after

17  discussion with Petitioner and an evaluation by psychologist Dr. Lea Christensen, she did not

18  believe Petitioner was competent to assist in his defense.  (Doc. 29-20 at 13-14).  The court

19  certified Petitioner to the superior court consistent with California Penal Code § 1368 for

20  determination of his competency to stand trial.  (*Id.*).  On December 1, 1989, the superior court

21  held a hearing on Petitioner's competency.  (Doc. 28-11 at 152-57).  Ms. Thompson agreed to

22  submit the issue on the reports of Dr. Howard Terrell and Dr. Charles Davis.  (*Id.* at 154-55).  Dr.

23  Terrell concluded it was "extremely likely that the Defendant is Malingering (Lying) about his

24  answers in order to escape culpability for his crimes" but there was a "small possibility that he

25  also suffers from a concurrent mental disorder."  (Doc. 28-25 at 6).  As such, Dr. Terrell

26  recommended finding Petitioner incompetent to stand trial at that time.  (*Id.* at 7).  Dr. Davis also

27  concluded Petitioner was malingering and recommended Petitioner be found competent to stand

28  trial.  (Doc. 28-26 at 5).  The superior court recognized the possibility Petitioner was suffering

1  from a mental disorder but ultimately found the evidence was not "sufficient enough" and instead

2  adopted the conclusion that Petitioner was malingering.  (Doc. 28-11 at 155).  The superior court

3  concluded Petitioner was competent to stand trial.  (*Id.* at 156).

### 2. Law and Analysis

5       A claim of ineffective assistance of counsel is evaluated under the two-prong test set out

6  in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under this test, "a petitioner must prove: (1)

7  that his counsel's performance fell below an objective standard of reasonableness (the deficient

8  performance prong); and (2) that there is a reasonable probability of a more favorable outcome if

9  counsel performed effectively (the prejudice prong)."  *Rogers v. Dzurenda*, 25 F.4th 1171, 1181

10  (9th Cir. 2022) (citing *Strickland*, 466 U.S. at 687-88, 694).  While a petitioner must prove both

11  prongs to be entitled to relief, "a court need not determine whether counsel's performance was

12  deficient before examining the prejudice suffered by the defendant as a result of the alleged

13  deficiencies."  *Strickland*, 466 U.S. at 697.

14       "The prejudice prong focuses on the question whether counsel's deficient performance

15  renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Rogers*, 25

16  F.4th at 1182.  In making this assessment, a reviewing court must "compare the evidence that

17  actually was presented to the jury with the evidence that might have been presented had counsel

18  acted differently."  *Hernandez v. Chappell*, 923 F.3d 544, 551 (9th Cir. 2019).

19       Here, even if the Court were to assume, without deciding, that counsel's performance was

20  deficient, Petitioner cannot show prejudice with respect to the competency proceedings.  While

21  counsel may have failed to alert the court to Petitioner's intellectual disability during the pretrial

22  competency proceedings, evidence of his intellectual disability was offered at trial and, as

23  discussed below in addressing Claim Two, did not support further competency proceedings.  As

24  such, there was no prejudice from counsel's failure to specifically inform the court of Petitioner's

25  intellectual disabilities before the initial competency proceedings or request a second round of

26  competency hearings.  Concerning counsel's failure to inform the experts that Petitioner was

27  intellectually disabled, there is nothing to support that such information would have altered their

28  conclusions that Petitioner was likely malingering, which were based on their own observations

1   and interactions with Petitioner.  Similarly, there is no reason to believe that the experts would

2   have provided opinions different than those in their reports had counsel proceeded to a hearing

3   rather than submitting the competency issue on the reports.

4       Because Petitioner cannot show he was prejudiced by counsel's actions at the competency

5   stage of the proceedings, the state court's rejection of his ineffective assistance of counsel claim

6   was not contrary to, or an unreasonable application of, clearly established federal law, nor was it

7   based on an unreasonable determination of the facts.  The undersigned recommends that Claim

8   One be denied.

9       **C. Failure to Conduct Additional Competency Proceedings**

10      In Claim Two, Petitioner asserts that substantial evidence before the trial court raised a

11  doubt as to his competency to stand trial due to his intellectual disability and the trial court erred

12  in failing to suspend proceedings and appoint the director of a regional center for the

13  developmentally disabled to evaluate Petitioner pursuant to California Penal Code § 1369(a).

14  (Doc. 1-3 at 43).  While acknowledging that pretrial proceedings addressed his competency,

15  Petitioner argues that Dr. Christensen's trial testimony "triggered the trial court's absolute, *sua*

16  *sponte* duty to suspend proceedings" and assess competency, regardless of the previous

17  competency determination.  (*Id.* at 43-47).

18          **1.  Background**

19      At trial, the defense called Dr. Christensen, a clinical psychologist, to testify regarding her

20  opinion of Petitioner's intellectual disability.  (Doc. 29-13 at 39).  Dr. Christensen testified that

21  she examined Petitioner in October 1989 at the Madera County Jail following his treatment at

22  Valley Medical Center.  (*Id.* at 41-42).  Dr. Christensen detailed tests conducted on Petitioner, the

23  results of those tests, and the opinions she formulated regarding Petitioner's mental capabilities.

24  (*See generally id.* at 42-85).  Through testing on Petitioner, Dr. Christensen determined his full-

25  scale IQ was 47, which would place him in a category as mild to moderately mentally retarded.[8]

26  (*Id.* at 85).  On cross-examination, Dr. Christensen specified that her testing revealed an IQ score

27

28  ───────────────
    [8] The Court recognizes the sensitivity around the term "mentally retarded" and uses it only for historical accuracy in
    relation to the trial court proceedings.

1   of 47 *that day* and recognized that other doctors achieved different results. (*Id.* at 124, 133). She

2   agreed with the prosecution that the difference could be attributed to the setting and

3   circumstances when she conducted the testing. (*Id.* at 133-35). At the time of the testing, Dr.

4   Christensen did not believe Petitioner was competent to stand trial. (*Id.* at 140-41).

5       On direct review following his conviction, Petitioner raised his argument that Dr.

6   Christensen's testimony should have prompted the trial court to initiate a second round of

7   competency proceedings, and the California Supreme Court rejected this claim. (Doc. 30-14 at

8   10-19). The court explained that Dr. Christensen's testimony was insufficient to require the trial

9   court to institute renewed competency proceedings given that "Dr. Christensen's conclusion

10  concerning [Petitioner's] intellectual functioning was, by her own acknowledgment, an outlier

11  that may have reflected the unusual circumstances present on the day of her evaluation rather than

12  the true extent of [Petitioner's] abilities." (*Id.* at 14-15). The court highlighted that while Dr.

13  Christensen testified her testing of Petitioner "yielded a full-scale IQ score of 47, which she

14  testified indicated moderate to severe intellectual disability," two other defense experts "testified

15  that they had tested [Petitioner's] full-scale IQ as 59 and 66, respectively—within the range of

16  mild, not moderate or severe, intellectual disability." (*Id.* at 16). Dr. Christensen "hypothesized

17  that the different results might have been attributable to various factors present on the day she

18  examined [Petitioner]," such as being conducted in an infirmary setting with distractions and poor

19  lighting while Petitioner was recovering from an injury. (*Id.* at 16-17). The court concluded:

20

21          [G]iven the confounding factors operative at the time of Dr.
            Christensen's evaluation—including that defendant, still recovering
22          from a gunshot wound, was immobilized in a head harness, in pain,
            and on medication, and that the testing was taking place in a
23          hospital environment that was apparently poorly lit and full of
            distractions—the trial court could properly find she lacked
24          "sufficient opportunity to examine" defendant for her opinion to
            raise a reasonable doubt as to his competency. (*People v. Ramos*
25          (2004) 34 Cal. 4th 494, 507-508, quoting *People v. Pennington*,
            *supra*, 66 Cal. 3d at p. 519.) The trial court therefore did not err in
26          failing to institute competency proceedings under section 1369,
            subdivision (a).

27  (*Id.* at 17).

28

                                    13

### 2. Law and Analysis

As an initial matter, to the extent Petitioner's claim relies on the trial court's failure to comply with California Penal Code § 1369(a)(2)—which requires the court to "appoint the director of the regional center" to determine whether a defendant has a developmental disability—such a claim is not grounds for federal habeas relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Given the deferential standard of review, the relevant question is whether the California Supreme Court's conclusion that the trial court was not required to *sua sponte* conduct a second competency hearing was contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts.

"It is undisputed that 'the conviction of an accused person while he is legally incompetent violates due process.'" *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010) (quoting *Pate v. Robinson*, 383 U.S. 375, 378 (1966)). "To be competent to stand trial, a defendant must have the 'capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.'" *Id.* (quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)). When the evidence before a court raises a "bona fide doubt" regarding a defendant's competence, the judge is required to conduct a competency hearing and this obligation continues through trial. *Id.* "[T]he test for such a bona fide doubt is whether a reasonable judge, situated as was the trial court judge …, should have experienced doubt with respect to competency to stand trial." *Id.* When reviewing whether a state trial judge should have *sua sponte* conducted a competency hearing, "a federal court may consider only the evidence that was before the trial judge" and "suggestive evidence includes the defendant's demeanor before the trial judge, irrational behavior of the defendant, and available medical evidence of the defendant's competence to stand trial." *Williams v. Woodford*, 384 F.3d 567, 604 (9th Cir. 2004).

As the California Supreme Court observed, Dr. Christensen's testimony regarding Petitioner's IQ was contradictory to other expert testimony and her testing was likely influenced

by the circumstances in which it was conducted.  Further, Dr. Christensen did not testify that she believed Petitioner was incompetent at the April 1991 trial, but rather that he was not competent at the time of the examination in October 1989.  Additionally, by the time Dr. Christensen testified during the defense's presentation, the trial judge had observed Petitioner's behavior over multiple days of trial.  The judge admonished Petitioner after he made a comment during the proceedings and Petitioner indicated he understood and complied with the judge's order.  (Doc. 29-11 at 159).  The judge interacted with Petitioner multiple times when Petitioner indicated a desire to waive certain rights, including his right to be present and his right to a speedy trial. (Doc. 29-12 at 180, 196).

Considering all the evidence before the trial court, including the judge's own observations of Petitioner and the conflicting testimony, the state court's decision that the trial court was not required to conduct a second round of competency proceedings was not contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts.  Accordingly, it is recommended that Claim Two be denied.

### D.  Ineffective Assistance – Failure to Investigate

Petitioner's next two claims present similar issues and will be addressed together.  Claim Three challenges counsel's failure to investigate and present evidence of his intellectual disability and mental illness to support that he could not form the required mental state to commit first degree murder.  (Doc. 1 at 54-55).  Similarly, Claim Four challenges trial counsel's failure to investigate and present evidence supporting that he acted in the heat of passion, which would support verdicts of second degree murder or voluntary manslaughter.  (*Id.* at 199).  In both claims, Petitioner essentially argues that had trial counsel submitted additional evidence related to his intellectual disability and mental illness, the evidence would show he could not form the required mental state for murder and the jury would not have convicted him.  (*See generally id.* at 54-233).  Petitioner relies on evidence submitted in support of his state habeas petition, including school records and post-conviction declarations from psychologists, school officials, family, friends, and other individuals who had interacted with Petitioner.  (*See id.*).  The California Supreme Court summarily rejected Petitioner's claims in his state habeas petition.  (See Doc. 33-

1    41).

2        These claims are analyzed under the same *Strickland* standard applied to Claim One

3    above.  Thus, to be entitled to relief, Petitioner must show not only that counsel's performance

4    was deficient but also that he was prejudiced by the deficient performance.  *Rogers*, 25 F.4th at

5    1181.  In the interest of efficiency, the Court once again assumes, without deciding, that counsel's

6    performance was deficient because Petitioner's claims fail on the prejudice prong.

7        Petitioner's argument that counsel was ineffective turns on the assumption that had

8    counsel presented additional evidence to support that he was intellectually disabled, the jury

9    would not have convicted him.  However, the jury's finding that Petitioner was able to form the

10   required mental state to commit first degree murder does *not* mean that it rejected Petitioner's

11   claim of intellectual disability.  None of the proposed evidence establishes that Petitioner's

12   intellectual disability rendered him unable to form the specific intent required to support his

13   convictions.  The prosecution highlighted this distinction in its cross-examination of Dr.

14   Christensen when it asked if she would agree that "a mentally retarded person can form an intent

15   to kill, that that's not a complex thought process," and she responded, "Yes. Even a three-year old

16   can form an intent to kill."  (Doc. 29-13 at 151).  Additional evidence to support that Petitioner

17   formed the required mental state and acted with premeditation and deliberation included that he

18   had made comments to Martha in the days before her death that "your ass is mine" once the baby

19   was born; came to Martha's home and shot a gun into the air after making this comment; and told

20   a mutual friend that if he could not have Martha, no one could.  (*See* Doc. 29-11 at 154, 191-92,

21   234; Doc. 29-12 at 67).

22       Considering all the evidence that was presented with the evidence that might have been

23   presented, the California Supreme Court could reasonably conclude that even had the additional

24   evidence been presented, there was not a probability that the outcome would be different.  Thus,

25   Petitioner has not shown that the state court's decision was contrary to, or an unreasonable

26   application of, clearly established federal law, or that it was based on an unreasonable

27   determination of the facts.  Accordingly, it is recommended that Claims Three and Four be

28   denied.

16

1        **E.  Jury Instruction**

2        In Claim Five, Petitioner asserts that the trial court's use of CALJIC No. 3.32 regarding

3   consideration of Petitioner's intellectual disability allowed the jury to consider such only with

4   respect to whether Petitioner committed the murder with "malice aforethought" and not with

5   respect to whether he acted with express malice and premeditation and deliberation to support

6   first degree murder.  (ECF No. 1-3 at 236-38).

7               **1.  Background**

8        At trial, the court instructed the jury:

9                   Evidence has been received regarding a mental defect or mental
                    disorder of the defendant Anthony Townsel at the time of the crime
10                  charged in Counts 1 and 2. You may consider such evidence solely
                    for the purpose of determining whether or not the defendant
11                  Anthony Townsel actually formed the mental state which is an
                    element of the crimes charged in Counts 1 and 2; to wit, murder.
12

13   (Doc. 29-14 at 242-43).

14       On appeal, the California Supreme Court concluded "the limiting version of CALJIC No.

15  3.32 given to the jury in this case was prejudicially erroneous, requiring reversal of the dissuading

16  count and the witness-killing special-circumstance allegation."  (ECF No. 30-14 at 42).  However,

17  the court rejected Petitioner's argument that the murder convictions must also be reversed

18  because the instruction prohibited the jury from considering the intellectual disability evidence

19  with respect to premeditation and deliberation.  (*Id.* at 45-51).  Relying on its prior decision in

20  *People v. Rogers*, 39 Cal. 4th 826 (2006), the court explained:

21                  Jurors were instructed that "[m]urder is classified into two degrees,
                    and if you should find the defendant guilty of murder you must
22                  determine and state in your verdict whether you find the murder to
                    be first or second degree." This instruction necessarily directed
23                  jurors, once they found that defendant killed with malice
                    aforethought as charged in Counts 1 and 2 (as to which defendant
24                  does not contend the jury was not properly instructed to consider
                    the intellectual disability evidence), to make the further
25                  determination whether he harbored the mental state required for
                    first degree murder, a determination to which the intellectual
26                  disability evidence was thus equally relevant and applicable. The
                    circumstance that much of the parties' closing arguments focused
27                  not on premeditation and deliberation but on intent to kill does not
                    alter this conclusion; nothing in those arguments expressly or
28                  impliedly directed jurors not to consider the intellectual disability

17

1
2

> evidence on the question whether defendant premeditated and
> deliberated the killings as required for a conviction of first degree
> murder.

3    (*Id.* at 49-50).

4    ## 2.  Law and Analysis

5    Federal habeas relief is not warranted simply because a jury instruction was "allegedly

6    incorrect under state law." *Estelle*, 502 U.S. at 71-72.  Rather, the relevant question is "whether

7    the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

8    process." *Id.* at 72.  In conducting this analysis, the instruction "must be considered in the context

9    of the instructions as a whole and the trial record" and a court must consider "whether there is a

10   reasonable likelihood that the jury has applied the challenged instruction in a way that violates the

11   Constitution." *Id.* (quotation marks omitted).

12   Here, Petitioner cannot meet his burden.  Of relevance, the trial court instructed the jury

13   that they must "[c]onsider the instructions as a whole and each in light of all the others." (Doc.

14   29-14 at 228).  The court advised the jury that it could not find Petitioner guilty of the murder

15   counts unless there was evidence to support the specific intent or mental state required.  (*Id.* at

16   232, 242).  The court identified the elements of murder: "One, a human being was killed; two, the

17   killing was unlawful; and three, the killing was done with malice aforethought." (*Id.* at 243).  The

18   court then instructed the jury regarding determining the degree of the murder:

19
20
21
22

> All murder which is perpetrated by any kind of willful, deliberate,
> and premeditated killing with the express malice aforethought is
> murder of the first degree. The word "willful" as used in this
> instruction means intentional. The word "deliberate" means formed
> or arrived at or determined as a result of careful thought in
> weighing the considerations for and against the proposed course of
> action. The word "premeditated" means considered beforehand.

23
24
25
26

> If you find the killing was preceded and accompanied by a clear
> deliberate intent on the part of the defendant to kill which was a
> result of deliberation and premeditation so that it must have been
> formed upon a pre-existing reflection and not upon a sudden heat of
> passion or other condition precluding the idea of deliberation, it is
> murder of the first degree.

27   (*Id.* at 244).  The jury was provided verdict forms allowing for findings of not guilty or guilty of

28   first degree murder, second degree murder, voluntary manslaughter, or involuntary manslaughter

1    on each count. (Doc. 28-3 at 271-77, 280, 283).

2         Considering the challenged instruction in combination with the other instructions and

3    verdict forms provided, no error occurred. The instructions made clear the mental states that must

4    be present to support a conviction of first degree murder and instructed the jury that it could

5    consider the mental defect evidence in determining whether Petitioner formed the required mental

6    state. Contrary to Petitioner's argument, and as concluded by the California Supreme Court, the

7    challenged instruction did not prohibit the jury from considering the mental defect evidence in

8    relation to premeditation and deliberation elements.

9         Because the California Supreme Court's determination of this claim was not contrary to,

10    or an unreasonable application of, clearly established federal law, nor was it based on an

11    unreasonable determination of the facts, the undersigned recommends that Claim Five be denied.

12         **F. Evidentiary Issues**

13         Multiple claims in the Petition assert challenges to the admission of evidence.

14         Claim Six challenges the admission of testimony from prosecution expert witness Dr. Lee

15    Coleman regarding the reliability and relevance of intelligence testing on a defendant's

16    competency. (Doc. 1-3 at 242-44). Claim Seven challenges the admission of lay witness

17    testimony concerning whether Petitioner was intellectually disabled. (*Id.* at 255-57). Claim Eight

18    challenges the prosecution's cross-examination of Dr. Christensen and alleges it resulted in the

19    admission of irrelevant evidence. (*Id.* at 264-74).

20         **1. Background**

21         On cross-examination, the prosecution questioned Dr. Christensen regarding the reports of

22    other experts that Petitioner was malingering, her own opinion that Petitioner was incompetent to

23    stand trial and should be referred to the regional center, and whether she believed Petitioner

24    should be released back into society. (Doc. 29-13 at 107-08, 140-45). After the defense rested,

25    the prosecution called Dr. Coleman as a rebuttal witness to address the defense's expert testimony

26    regarding Petitioner's IQ scores. (Doc. 29-14 at 50). Specifically, Dr. Coleman testified that "an

27    IQ test is not a reliable judge of somebody's intelligence," "a mental status examination is not a

28    reliable guide to what a person's orientation or understanding or current mental state is," and "a

1    personality test is not a reliable guide to somebody's personality." (*Id.* at 57-58).  The prosecutor

2    also called a counselor and two teachers from Madera High School who had interacted with

3    Petitioner while he was in school.  (*See* Doc. 29-14 at 184-208).  The witnesses generally testified

4    that Petitioner was in the special education program in school, but they did not believe he was

5    mentally retarded.  (*Id.*).

6          Petitioner raised his challenges regarding this evidence on direct review and the California

7    Supreme Court denied all relief.  The court concluded "Dr. Coleman testified, based on the

8    professional literature and his own study, about psychological evaluation generally—including

9    intelligence, neuropsychological, and personality testing—and its limitations in terms of the

10   inferences it can support in the forensic setting concerning a defendant's mental state at the time

11   of an offense." (ECF No. 30-14 at 25).  This testimony was proper rebuttal to the defense

12   experts' testimony.  (*Id.*).  Concerning the lay witness testimony that Petitioner was not

13   intellectually disabled, the court found no error because "two of the defense expert witnesses,

14   Drs. Christensen and Powell, had acknowledged on cross-examination that defendant's

15   intellectual disability would be noticeable to those close to him" and "[t]he prosecution was

16   entitled to rebut their testimony with that of school personnel who had worked with defendant and

17   not perceived him to be intellectually disabled." (*Id.* at 33).  As to the cross-examination of Dr.

18   Christensen, the court concluded all topics covered were relevant to the issues at trial.  (*Id.* at 38-

19   41).

20                    **2.  Law and Analysis**

21         As set forth above in disposing of other claims, federal habeas relief is not warranted

22   based only on alleged errors in state law.  *Estelle*, 502 U.S. at 67-68.  This includes alleged errors

23   in interpreting and applying the state evidentiary rules.  *Id.* at 72.  *See Walden v. Shinn*, 990 F.3d

24   1183, 1205 (9th Cir. 2021) ("we cannot grant federal habeas relief founded on an alleged non-

25   constitutional state evidentiary error.").  In such circumstances, relief is only warranted if the

26   evidence "by itself so infected the entire trial that the resulting conviction violates due process."

27   *Estelle*, 502 U.S. at 72.  Thus, to present a viable claim on federal habeas review based on an

28   error of state law, a petitioner must show that the alleged state error was "so arbitrary and

20

capricious as to constitute an independent due process … violation." *Richmond v. Lewis*, 506

U.S. 40, 50 (1992) (citation omitted).  The Supreme Court holds as a general proposition that the

improper admission of evidence may violate due process when the evidence "is so extremely

unfair that its admission violates fundamental conceptions of justice." *Dowling v. United States*,

493 U.S. 342, 352 (1990).

        Here, Petitioner cannot establish that admission of any of the challenged evidence

amounted to a due process violation.  Nor, in fact, does Petitioner cite any authority for the

proposition that the claimed evidentiary errors below (improper admission of expert testimony

concerning referenced testing reliability and other purported irrelevant evidence) could or did

arise to the level of due process violation.  (*See* Doc. 1-3 at 242-44, 255-57, 264-74; Doc. 72 at

57-68, 60-62, 64-65). Concerning the cross-examination of Dr. Christensen, as the California

Supreme Court concluded, the questions went to the Dr. Christensen's credibility, the reliability

of her report, and her conclusions that Petitioner was not malingering.  As to Dr. Coleman, the

jury heard testimony regarding his education and how he reached his conclusions, laying the

foundation for his testimony.  While Coleman testified as to his opinion that IQ testing was not

relevant to the court proceedings, the trial court clearly instructed the jury that it was free to either

accept or reject this opinion.  (*See* Doc. 29-14 at 238) ("You are not bound to accept an expert

opinion as conclusive but should give to it the weight to which you find it to be entitled. You may

disregard any such opinion if you find it to be unreasonable.").  Finally, concerning the school

employees' testimony, such was offered as direct rebuttal to statements from defense expert

Frank Powell that Petitioner's mental retardation "[s]hould be" noticeable to teachers and

counselors.  (*See* Doc. 29-12 at 277).

        Because any alleged error in admitting the evidence is (1) a matter of state law and (2)

does not amount to a due process violation, Petitioner is not entitled to federal habeas relief.  *See*

*Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) (holding admission of expert evidence

that was not contrary to, or an unreasonable application of, Supreme Court precedent could not

violate petitioner's due process rights); *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir.

2009) (noting there has been no clear ruling that the "admission of irrelevant or overtly

1    prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

2    writ.").  Accordingly, it is recommended that Claims Six, Seven, and Eight be denied.

3    **G. Ineffective Assistance of Counsel – Trial Evidence**

4        Petitioner raises additional ineffective assistance of counsel claims based on evidence his

5    counsel did or did not present at trial.  Claim Ten[9] challenges trial counsel's failure to put on

6    evidence to rebut the prosecution's assertion that the September 20, 1989 letter motivated him to

7    commit the crimes.  (Doc. 1-3 at 280-82).  Claim Eleven alleges trial counsel improperly

8    provided the pretrial competency reports to defense experts, "thereby making admissible the

9    damaging conclusions in the reports that petitioner was malingering in the competency

10   evaluation."  (*Id.* at 292).  Finally, Claim Twelve challenges trial counsel's failure to call a

11   forensic expert to rebut the prosecution's evidence concerning the injuries to Mauricio.  (*Id.* at

12   308-09).  The California Supreme Court summarily rejected Petitioner's claims in his state habeas

13   petition.  (See Doc. 33-41).

14       **1. Background**

15       At trial, the prosecution offered into evidence a September 20, 1989 letter to Petitioner

16   from the Madera County Justice Court informing him a criminal complaint had been filed against

17   him.  (Doc. No. 28-13 at 74).  A copy of the envelope the letter allegedly came in was also

18   admitted as evidence.  (*Id.* at 75).  The postmark on the envelope is visible but illegible in the

19   record.  (*See id.*; *see* Doc. 1-1 at 79).  A former Madera Justice Court clerk testified that she could

20   not tell for sure the day that she sent the letter out and could only assume that it went out the same

21   day she wrote it—September 20, 1989.  (Doc. 29-12 at 135).  Teresa Martinez identified the

22   September 20 letter as being inside the envelope Petitioner handed to her when he came to her

23   home and instructed her to tell Martha "she better stay inside the house" on September 22, 1989.

24   (Doc. 29-11 at 149-51).

25       The prosecution called Dr. Jerry Nelson, the pathologist who performed the autopsy on

26   the victims, to testify at trial.  (Doc. 29-12 at 77-79).  Dr. Nelson opined that based on the bullet

27   wounds to Mauricio, he would have been "either crouched or bent forward at the waist" when he

28

---

[9] Because Claim Nine alleges cumulative error, the Court addresses it after addressing the individual claims.

22

1    was shot two times, once from approximately twelve to twenty-four inches away, and a shot to

2    the right shoulder, which passed through vital organs, was fatal.  (*Id.* at 83-84).  On cross-

3    examination, defense counsel questioned Dr. Nelson regarding whether an unexpected collision

4    between two people could result in the defensive posture he described the male victim assuming

5    and whether a difference in height could also cause the angle of the wounds, to which Dr. Nelson

6    replied affirmatively.  (*Id.* at 93-94).  Dr. Nelson also admitted that he could not exclude that the

7    gun had been less than twelve inches away at the time of the shot.  (*Id.* at 96).  He also indicated

8    that he could not reach a conclusion as to which of the two shots were fired first.  (*Id.* at 99).

9          The defense called three experts at trial—Dr. Frank Powell, Dr. Christensen, and Dr.

10   Bradley Schuyler—to testify regarding Petitioner's intellectual disability.  (*See* Doc. 29-13 at 29).

11   During cross-examination of Dr. Powell, the prosecution asked him about the pretrial reports

12   finding that Petitioner was malingering.  (Doc. 29-12 at 267).  Dr. Powell admitted that based on

13   the pretrial reports, there was a possibility that Petitioner was malingering.  (*Id.* at 281-82).

14   During direct examination of Dr. Christensen, defense counsel questioned her about the

15   malingering conclusion in the pretrial reports, eliciting testimony that the reports were written by

16   psychiatrists who performed no testing.  (Doc. 29-13 at 97).  The prosecution questioned Dr.

17   Christensen about differences in her report and the pretrial reports, specifically with regards to

18   whether Petitioner experienced hallucinations.  (*Id.* at 107).  However, throughout her testimony,

19   Dr. Christensen maintained that Petitioner was not malingering.  (*See generally id.* at 107-27).

20   Dr. Schuyler testified that there was some concern expressed to him regarding malingering but,

21   based on the testing performed, he did not believe Petitioner was malingering on the tests

22   administered.  (*Id.* at 213-14).

23                    **2.  Law and Analysis**

24          These claims are analyzed under the *Strickland* standard such that Petitioner must show

25   both that counsel's performance was deficient and that he was prejudiced by such deficient

26   performance.  *Rogers*, 25 F.4th at 1181.  However, Petitioner cannot make either showing.

27          First, Petitioner cannot establish that trial counsel was deficient.  As to the letter,

28   Petitioner argues trial counsel failed to recognize and elicit testimony and evidence that the

envelope that allegedly contained the letter was postmarked September 22, 1989, such that he could not possibly have received it by 10:00 a.m. the same day.  (*See* Doc. 1-3 at 283-86).  However, the record reflects that on cross-examination of Teresa, defense counsel questioned her regarding the contents of the letter and Martha's reaction to receiving it, specifically her lack of fear or anger.  (Doc. 29-11 at 184-85).  It is not unreasonable to conclude that trial counsel's decision to focus specifically on the contents of the letter to show that they would not have motivated Petitioner to commit the crimes rather than on whether he could have received the letter on September 22—which would have likely required additional expert testimony from a postal employee—was a strategic decision.  *See Catlin v. Broomfield*, 124 F.4th 702, 735-36 (9th Cir. 2024) (decision not to present evidence that would be inconsistent with planned theme of the case was a strategic decision).

Petitioner has also failed to show deficient performance concerning the failure to call a forensic expert.  Petitioner fails to identify any evidence to support that counsel declined or neglected to consult with such an expert and that the decision not to call an expert at trial was anything but a strategic decision.  This "lack of evidence is fatal to [Petitioner's] claim." *Atkins v. Bean*, 122 F.4th 760, 773-74 (9th Cir. 2024) (lack of evidence as to "what avenues of investigation counsel followed, how much investigation was performed, or what information was uncovered" was insufficient to overcome presumption that counsel's conduct fell within the wide range of reasonable assistance).

Petitioner's challenge to trial counsel providing the pretrial competency reports to the trial experts also fails.  The Ninth Circuit has "repeatedly found trial counsel ineffective for failing to adequately prepare experts or provide them with sufficient 'informational foundations.'" *Rogers*, 25 F.4th at 1185.  Thus, contrary to Petitioner's argument, counsel actually may have been ineffective had they *failed* to provide the pretrial reports to the experts.  *Id.*  Further, because the prosecution had access to the pretrial reports, trial counsel could have reasonably anticipated that the prosecution would respond to the intellectual disability evidence by arguing that Petitioner was malingering, and counsel could have chosen to present the reports to the experts in anticipation of this argument.  These strategic decisions cannot be said to amount to deficient

1    performance.

2         Even if counsel's performance was deficient as to any of these claims, Petitioner cannot

3    show prejudice.  Regarding the letter, such was relevant to support the witness-killing special

4    circumstance and separate dissuading a witness count, which were both overturned by the

5    California Supreme Court.  (Doc. 30-14 at 66).  Petitioner does not present *any* argument as to

6    how evidence that the murders were not motivated by the letter, but rather that he was angry for

7    some other reason, would result in a finding that he did not commit the murders.  Concerning the

8    expert testimony, even ignoring any discussion of malingering based on the pretrial reports, the

9    prosecution elicited testimony concerning the inconsistent results amongst the defense experts,

10   including the wide range of IQ scores.  Thus, the prosecution had already challenged the

11   reliability of the experts' opinions.  As to the failure to call a forensic expert witness, defense

12   counsel cross-examined Dr. Nelson in such a way to cast doubt on his conclusions without

13   separate expert testimony.  (*See* Doc. 29-12 at 93-99).  Considering all the evidence that was

14   actually presented at trial with the evidence Petitioner asserts should have been presented, there

15   was not a reasonable likelihood that the result of the proceedings would have been different.

16        Because Petitioner cannot show that his counsel rendered deficient performance or that he

17   was prejudiced by counsel's actions at trial, the state court's rejection of Petitioner's ineffective

18   assistance of counsel claims was not contrary to, or an unreasonable application of, clearly

19   established federal law, nor was it based on an unreasonable determination of the facts.  The

20   undersigned recommends that Claims Ten, Eleven, and Twelve be denied.

21        **H.  Juror Misconduct**

22             **1.  Background**

23        In Claim Fourteen, Petitioner alleges that jurors improperly discussed his failure to testify

24   at the guilt phase of trial.  (ECF No. 1-3 at 322).  Petitioner raised this claim in his state habeas

25   petition and presented declarations from two jurors in support.

26        In one declaration, the jury foreperson indicates that "[d]uring the jury deliberations – it

27   may have been during the guilt phase or the penalty phase or both – some of the jurors discussed

28

1   the fact that Anthony did not testify." (ECF No. 33-35 at 48). A second juror declared:

> During the penalty phase deliberations, we discussed the fact that
> Anthony did not testify at either the guilt or penalty phase. I recall
> the judge's instruction that we could use sympathy toward the
> defendant in making our decision. But because he didn't testify,
> there was no reason to feel sympathy for him. … The evidence that
> was presented at the trial did not give me a reason to feel sympathy
> for him, which I might have if he had testified.

(*Id.* at 130-31). The California Supreme Court summarily denied Petitioner's claim.

### 2. Law and Analysis

In determining whether juror misconduct is grounds for habeas relief, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Anderson v. Calderon*, 232 F.3d 1053, 1098 (9th Cir. 2000). Petitioner's claim is similar to one presented in *Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006). In *Raley*, the petitioner argued his sentence should be overturned because the jury "considered constitutionally forbidden topics," including his failure to testify. *Id.* at 803. The petitioner relied on deposition testimony from two jurors. *Id.* The Ninth Circuit concluded the petitioner's failure to testify was not extrinsic evidence, explaining that "[a]lthough the jury's discussion of this issue clearly violated the trial court's instructions, what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it. We may not inquire into a jury's deliberations concerning the evidence at trial." *Id.* Thus, the Ninth Circuit affirmed the lower court's denial of habeas relief on petitioner's juror misconduct claim. *Id.* at 795.

Petitioner fails to cite any Supreme Court precedent indicating that (1) the Court may consider the juror's declarations concerning their deliberations and (2) he is entitled to relief based on the alleged misconduct. In light of *Raley* and in the absence of such case law, Petitioner has not shown that there was no reasonable basis for the state court to deny relief. *Harrington*, 562 U.S. at 98-00. Accordingly, it is recommended that Claim Fourteen be denied.

### I. Cumulative Error

In Claims Nine and Eighteen, Petitioner raises claims of cumulative error. (Doc. 1-3 at 275-279, 351-52).

"The cumulative effect of multiple errors can violate due process even where no single

1    error rises to the level of a constitutional violation or would independently warrant reversal."

2    *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).  Habeas relief is warranted under the

3    cumulative effects doctrine "when there is a 'unique symmetry' of otherwise harmless errors,

4    such that they amplify each other in relation to a key contested issue in the case."  *Id.*  However,

5    relief is only warranted when the cumulative error rendered the trial and sentencing

6    "fundamentally unfair."  *Id.*  Further, federal courts "do not consider the prejudicial effect of

7    nonexistent errors.  *Waidla v. Davis*, 126 F.4th 621, 640 (9th Cir. 2024).

8    　　　Having concluded Petitioner's claims all lack merit, there are no underlying errors to

9    support a finding of cumulative error.  *Williams v. Filson*, 908 F.3d 546, 570 (9th Cir. 2018) (a

10   court "cannot consider the cumulative effect of *non*-errors") (emphasis in original).  Nor does the

11   record support that Petitioner's trial and amended sentence are fundamentally unfair.

12   Accordingly, Claims Nine and Eighteen are without merit and should be denied.

13   **IV.    CERTIFICATE OF APPEALABILITY**

14   　　　"[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

15   district court's denial of his application."  *Miller-El v. Cockell*, 537 U.S. 322, 335-36 (2003). Rule

16   11 of the Rules Governing § 2254 Cases requires a court to "issue or deny a certificate of

17   appealability when it enters a final order adverse to the applicant."  A certificate of appealability

18   will issue "only if the applicant has made a substantial showing of the denial of a constitutional

19   right."  28 U.S.C. § 2253(c)(2).  To make this showing for claims rejected on procedural grounds,

20   a movant must demonstrate "that jurists of reason would find it debatable whether the petition

21   states a valid claim of denial of a constitutional right and that jurists of reason would find it

22   debatable whether the district was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S.

23   473, 484 (2000).  When a claim is rejected on the merits, the petitioner "must demonstrate that

24   reasonable jurists would find the district court's assessment of the constitutional claims debatable

25   or wrong" to warrant a certificate of appealability.

26   　　　Because Petitioner has not made a substantial showing of the denial of a constitutional

27   right, the undersigned recommends that the court decline to issue a certificate of appealability.

28   ///

1 | **V.    RECOMMENDATION**

2 | For the reasons set forth above, it is **RECOMMENDED**:

3 |     1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. 1);

4 |        and

5 |     2.  Petitioner be denied a certificate of appealability.

6 |     These findings and recommendations are submitted to the district judge assigned to this

7 | action, pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the

8 | United States District Court, Eastern District of California.  Within **FOURTEEN (14)** days of

9 | service of this recommendation, any party may file written objections to these findings and

10 | recommendations with the Court and serve a copy on all parties.  Such a document should be

11 | captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge

12 | will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. §

13 | 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may

14 | waive the right to appeal the district judge's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39

15 | (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

16 | IT IS SO ORDERED.

17 | Dated:   **February 27, 2025**

18 | UNITED STATES MAGISTRATE JUDGE